IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

RACHEL L., individually and ) CIVIL NO. 11-00756 LEK-BMK
on behalf of her minor child, )
JULIA L., )
)
        Plaintiffs, )
)
    vs. )
)
STATE OF HAWAII, DEPARTMENT )
OF EDUCATION, and KATHRYN )
MATAYOSHI, in her official )
capacity as Acting )
Superintendent of the Hawaii )
Public Schools, )
)
        Defendants. )
_____ )

**ORDER AFFIRMING HEARINGS OFFICER'S NOVEMBER 29, 2011 DECISION**

        Before the Court is Plaintiffs Rachel L. ("Mother"),
individually and on behalf of her minor child, Julia L.'s
("Student," both collectively "Plaintiffs"), appeal from the
Administrative Hearings Officer's ("Hearings Officer")
November 29, 2011 Findings of Fact, Conclusions of Law and
Decision ("Decision"[1]) dismissing Plaintiffs' Request for
Impartial Due Process Hearing ("RIH"), pursuant to the
Individuals with Disabilities Education Act of 2004 ("IDEA"), 20
U.S.C. § 1400 et seq.  Plaintiffs filed their opening brief on
June 12, 2012.  Defendants the Department of Education, State of
Hawaii, and Kathryn Matayoshi, in her official capacity as

_____
        [1] The Decision is Exhibit 14 to the Administrative Record on
Appeal ("ROA"), at 122-152.

Superintendent of the Hawaii Public Schools ("Defendants" or "the DOE"), filed their answering brief on July 16, 2012. This appeal came on for hearing on August 27, 2012. Appearing on behalf of Plaintiffs was Keith Peck, Esq., and appearing on behalf of Defendants was Gary Suganuma, Esq. After careful consideration of the supporting and opposing memoranda, and the arguments of counsel, the November 29, 2011 Decision is HEREBY AFFIRMED.

I. <u>Factual and Administrative Background</u>

At the time in question, Student was twelve years old and in the sixth grade at Redemption Academy. Student is eligible for special education and related services under the IDEA in the category of autism. Student's former home school was Kaelepulu Elementary School ("Former Home School"), and her current home school is Kailua Intermediate School ("Current Home School"). Student attended Redemption Academy from 8:00 a.m. until 1:00 p.m. and received services from Pacific Autism Center from 1:15 p.m. until 3:30 p.m. Mother has a doctorate in clinical psychology and has worked for a local children's hospital in the area of pediatric trauma for seven years. She has a regular caseload and also handles emergencies, so she is always at the hospital from 8:00 a.m. to 3:00 p.m. and sometimes until 8:00 at night. Mother and Student's other parent ("Parent #2," collectively "Parents") adopted student at twenty-two months. [Decision at 1, 4-5.]

Student's Former Home School began preparing for Student's annual Individualized Education Program ("IEP") meeting approximately three months before an April 21, 2011 annual review deadline. On January 18, 2011, Student Services Coordinator Peggy Yogi sent Mother an e-mail with a checklist of things to do in order to prepare for Student's annual IEP. The e-mail stated that Melanie Calleon would be Student's Care Coordinator for the year. The e-mail was sent to Mother's email address,[2] and Ms. Calleon was copied on the email. Ms. Calleon is a licensed special education teacher and was previously the Student Care Coordinator when Student was in the first, second, and third grades. [Id. at 5.]

On February 24, 2011, Ms. Yogi sent Mother an e-mail informing her that Ms. Calleon would be scheduling an observation for the next week. The e-mail asked Mother to provide a current report card, progress reports on the IEP, and any other data that would be relevant to writing Student's annual IEP. This e-mail was sent to Mother's email address and copied to Ms. Calleon. On February 25,2001, Teri Lynn Kim, Student's teacher at Redemption Academy, sent Ms. Calleon an email stating that Ms. Yogi had informed her that Ms. Calleon would be scheduling a time for observation and asked Ms. Calleon to contact her regarding

---

[2] Mother's original email dress includes Student's last name, and is therefore omitted. The Court instead refers to this original email address as "Mother's email address".

3

obtaining approval for this observation.  Ms. Kim copied her
e-mail to Mother to Mother's email address.  On February 28,
2011, Mother sent Ms. Calleon an e-mail regarding scheduling the
observation from Mother's email address, and asked her to please
respond to this same address.  On March 1, 2011, Ms. Calleon sent
Ms. Kim an e-mail confirming the date and time of the classroom
observation and requesting current data, reports and any other
information on academic, behavior and social areas, and copied
Mother at Mother's email address.  Ms. Kim replied to Ms.
Calleon's March 1, 2011 email, and offered to have a telephone
conference after the observation period and requested a DOE
standard observation form.  Mother was copied on the email at
Mother's email address.  Ms. Calleon replied the same day to this
email, again with a copy to Mother's email address.  Mother sent
an e-mail to Ms. Calleon on March 3, 2011 confirming that Ms. Kim
would provide Ms. Calleon with a grade update and information
about progress "re IEP."  The email also stated that Ms. Calleon
would be provided a copy of the "bx plan."  Like the previous
emails, Mother sent this e-mail from Mother's email address.
[Id. at 6-7.]

        On March 4, 2011, Ms. Calleon observed Student for
approximately two hours in Student's classroom at Redemption
Academy.  On March 22, 2011, Ms. Calleon sent an e-mail to
Ms. Kim to request Student's report cards and information about

4

Ms. Kim's availability between April 5 and April 15, 2011.
Ms. Calleon also sent an e-mail to Mother on March 22, 2011
asking for a copy of the "bx plan" referred to in Mother's e-mail
of March 3, 2011 because it was not provided to Ms. Calleon when
she did her classroom observation.  The e-mail also asked about
Mother's availability during the first two weeks of April so that
Ms. Calleon could schedule Student's annual IEP meeting.  This
e-mail was sent to Mother's email address.  Ms. Calleon sent
another e-mail to Mother at the same address on March 23, 2011
asking Mother to write a letter stating her desire for Student to
opt out of certain testing for the 2010-2011 school year.  [Id.
at 7-8.]

On March 30, 2011, Ms. Calleon sent Mother a letter as
an attachment to an e-mail about Student's IEP, noting that it
due for review by April 21, 2011.  The letter offered meeting
times on April 12, 13, or 14, 2011.  It asked Mother to propose
alternatives dates and times before April 21 if those three dates
were not available, and asked for a response by April 6.
April 12, 2011 was set as the meeting date if there was no
response by April 6.  The letter offered Mother the option of
participating in the IEP meeting by telephone if she was not able
to participate in person.  The letter further stated that
Redemption Academy and Pacific Autism Center would be notified of
the three dates so they could be reserved and that both schools

would be notified once a date was finalized.  In addition, the letter requested updated assessment information, report cards, behavior support plans and relevant data because the information had not been provided despite two previous requests.  The letter was sent by email to Mother's email address and was also sent by regular mail to Mother.  Without receiving a response to her March 30, 2011 letter and e-mail, Ms. Calleon sent Mother another letter on April 1, 2011 that was identical to the March 30 letter, except that it changed the default date for the meeting to April 14 if the DOE did not hear from Mother by April 6, 2011. This letter was also sent by e-mail to Mother's email address and by regular mail.  [Id. at 8.]

The DOE mailed Plaintiffs a Conference Announcement dated April 7, 2011 for a proposed conference on April 14, 2011 to review Student's IEP plan.  Mother testified that she responded to this announcement by sending a text message during the noon hour on April 8, 2011 to the DOE stating that Parent #2 was leaving for the week and that the April 14, 2011 IEP meeting needed to be cancelled.  No alternative dates were proposed. Ms. Calleon phoned Mother back that day and left a voicemail message requesting availability for the week beginning April 18, 2011.  Mother did not respond.  [Id. at 9.]

On April 8, 2011, the DOE sent Mother a draft IEP for the period from April 15, 2011, through April 14, 2012.  In

addition to the voicemail message on April 8, 2011, the DOE
e-mailed Mother at Mother's email address on April 11, 2011,
asking if April 19 or April 20, 2011 would be good days for the
IEP meeting.  About two hours later on April 11, 2011, receiving
no response from Mother, Ms. Calleon sent an e-mail to Mother
stating that the April 1, 2011 letter had asked for a response by
April 6 but that the DOE did not hear from Mother, and notified
her that the IEP meeting would go forward on April 14, 2011, but
that Mother could participate by telephone if she was unable to
personally attend.  If Mother was not able to personally attend,
the e-mail stated that another meeting would be scheduled to
review and revise the IEP.  A copy of this e-mail was also sent
by mail on April 13, 2011.  [Id. at 10.]

        At 10:28 a.m. on April 13, 2011, Mother sent a text
message to Ms. Calleon stating that Parent #2 was traveling and
that Mother had cancelled the proposed IEP meeting the previous
week.  On the morning of April 14, 2011, Ms. Calleon sent an
e-mail to Mother's same e-mail address, acknowledging receipt of
Mother's text message of the previous day about canceling the
April 14 IEP meeting.  The e-mail indicated that the IEP meeting
was being held to meet the annual time line and that Ms. Calleon
would schedule another meeting to revise the IEP with input from
the entire team.  She requested that Mother send her three dates,
before May 6, 2011, that she would be available to meet.  The DOE

held Student's annual IEP meeting on April 14, 2011 and the only attendees were DOE personnel. [Id. at 11.]

On April 25, 2011, the DOE wrote Parents a letter with enclosed copies of Prior Written Notices, the April 14, 2011 IEP, a Transition Plan dated April 14, 2011, and a Parent Rights and Procedural Safeguards notice. The letter was signed by the Principal of Student's Former Home School, sent by certified mail on April 26, 2011, and signed for by Parent #2 on May 5, 2011. The April 25 letter stated that the IEP meeting went forward on April 14 and that the DOE would like to meet with Parents to review the proposed program and consider their input. The letter asked for three dates that Parents were available to meet and review the DOE's proposed IEP. The letter also allowed for Parents to participate by telephone if they were unable to attend in person. On May 11, 2011, Parent #2 left the Principal a phone message, indicating that Parent #2 wanted to discuss the IEP. The Principal asked Ms. Calleon to return Parent #2's telephone call, believing it was related to scheduling the meeting. Ms. Calleon called Parent #2 back that day and left a message. Later on May 11, 2011, Parent #2 called Ms. Calleon back and requested that the Principal return her call because the Principal was the person whom Parent #2 had left the message for. The Principal called Parent #2 back later that day and Parent #2 told Principal that the preferred time for Parents to meet for an

IEP was on Friday mornings after 9:00 a.m. [Id. at 12.]

On May 12, 2011, Ms. Calleon sent the other members of the IEP team an e-mail advising that Parents were requesting a meeting. Based upon the Parents' availability and the forthcoming end of the school year, the only day to schedule the meeting was Friday, May 27, 2011, at 9:30 a.m. On May 13, 2011, Principal left a phone message at Pacific Autism Center inviting a representative to the May 27 IEP meeting. On May 16, 2011, Ms. Calleon sent Redemption Academy a follow-up e-mail to one sent May 12, 2011, inviting a representative to attend the May 27 IEP meeting. On May 20, 2011, Ms. Calleon sent Parents a meeting notice for the May 27, 2011 IEP meeting by regular mail. On May 24, 2011, Ms. Calleon sent an e-mail to Mother at the same email address requesting confirmation that Mother had received the meeting notice for the May 27, 2011 meeting. On May 25, 2011, Principal called Parent #2 to ask if Parents were coming to the May 27 revision IEP. Parent #2 told her that they were not. Principal thereafter instructed Ms. Calleon to notify the rest of the IEP team that the meeting was cancelled. [Id. at 12-13.]

On June 4, 2011, Mother sent Ms. Calleon an e-mail in reply to Ms. Calleon's e-mail dated May 24, 2011 stating that "this is no longer my active email for quite some time" and informing Ms. Calleon of Mother's new e-mail address. [Id. at 11-12.] According to Mother, she informed the DOE that her

e-mail address had changed at a meeting with a DOE autism specialist and Ms. Yogi on February 11, 2011, but that Ms. Calleon was not at this meeting. Mother did not send any DOE personnel any written notice, either by letter or e-mail, that her e-mail address had changed prior to June 4, 2011. [Id. at 4.]

The April 14, 2011 IEP provided Student with the same Extended School Year ("ESY") services as in her previous IEP. She was to receive services after a break of one day, and begin ESY services on the second day.

On June 14, 2011, Plaintiffs filed their RIH with the DOE. [ROA at 4-7.] The RIH asserts that Student's IEP dated April 14, 2011 denied Student a Free Appropriate Public Education ("FAPE"). The RIH sought the following:

> 1. Award reimbursement to Petitioners for expenses related to the evaluation, consultation and observations for Student in assessment of Students' needs by privately obtained professionals;
> 2. award reimbursement to Petitioners for any educational and related expenses incurred for [her] education and related expenses through the Pacific Autism Center and through support providers[.]

[Id. at 6-7.]

The Hearings Officer convened the due process hearing on September 29, 2011, and the parties filed written closing arguments. [Decision at 4.]

The Hearings Officer framed the issues presented as whether the April 14, 2011 IEP resulted in a denial of FAPE because:

> a. The IEP was conducted without a parent in attendance even though the parent timely informed the Respondent of her unavailability.
> b. The IEP was insufficient because the DOE developed no Behavioral Support Plan for the offered placement.
> c. The Extended School Year services were improperly constituted where they failed to consider Student's individual needs during breaks.
> d. The offered "Transition Plan" is insufficient to support the Student's transfer from her current program into the offered program and placement, "and is not an element of the IEP offer."

[Id. at 15-16 (footnotes omitted).]

## A.  Parental Participation at the April 14, 2011 Meeting

The Hearings Officer ruled that Plaintiffs failed to demonstrate that the April 14, 2011 IEP was improperly conducted without a parent in attendance resulting in a denial of FAPE. The Decision states as follows:

> In the present case, the Hearings Officer concludes that the DOE made reasonable efforts to find a mutually convenient date for the IEP meeting. The DOE tried to accommodate Mother's desire to have Parent #2 attend the meeting as well as Mother. The DOE sent a draft IEP of great length on April 8, 2011 so that Mother and Parent #2 would be apprised in advance of what the DOE was thinking for this potentially lengthy and complicated IEP. As discussed more fully below, the DOE adequately communicated the proposed IEP meeting date to Mother, presented some alternative dates, and received no cooperation from Mother in scheduling the meeting. Mother never presented any alternative dates.

In addition, the DOE was faced with the statutory deadline of April 21, 2011 per the annual review requirement of 20 U.S.C. §1414(d)(4)(A) and 34 C.F.R. §300.324(b). This situation is basically the same as the one facing the school district in the [E.P. v. San Ramon Valley Unified School District, No. C05-01390 MJJ, 2007 WL 1795747 (N.D. Cal. June 21, 2007),] case. Holding the IEP meeting before the statutory deadline was <u>not</u> an instance of scheduling the meeting for the convenience of the DOE representatives' schedules.

Further, the DOE always recognized that the April 14, 2011 IEP was not necessarily the final version of the IEP. There was ample time to revise that IEP before the start of the next school year, and the DOE promptly initiated steps to set up a revision IEP meeting where Parents would be in attendance and personally submit their concerns. Parents inexplicably failed to participate in the revision meeting set up to meet their schedule demands.

Petitioners rely on the portion of the <u>Shapiro v. Paradise Valley Unified School District</u>[, 317 F.3d 1072 (9th Cir. 2002),] opinion that states: "After-the-fact parental involvement is not enough." 317 F.3d at 1078. That statement was made, however, with reference to a factual context where there was no need for the IEP meeting to be held on the date chosen by the district other than the convenience of the district representatives' schedule, no acknowledgment by the district that the IEP prepared at the meeting without the parents was only "proposed," and no effort by the district to promptly schedule an IEP with the parents to go over the "proposed" IEP.

In <u>E.P. v. San Ramon Valley Unified School District</u>, <u>supra</u>, the district offered the parents another IEP meeting later in the school year (which was much later than in this case where the additional IEP meeting was offered well before the relevant school year started). The parents relied on the above statement from the <u>Shapiro</u> case, but the Court did not view that statement as a per se test. There, as here, the district did not present a completed IEP to the parents on a "take-it-or-leave-it" basis and offered a "safety net"

> of an additional IEP meeting to consider the
> parents' concerns.  The statement from the <u>Shapiro</u>
> case relied upon by Petitioners herein must be
> viewed in the entire context of events.  Here, as
> in the <u>E.P. v. San Ramon Valley Unified School
> District</u> case, the statement does not compel a
> decision by the Hearings Officer in favor of
> Petitioners.

[<u>Id.</u> at 20-21.]  The Hearings Officer also found that "Mother

failed to reasonably cooperate in setting up a meeting date prior

to the statutory deadline.  To the contrary, her actions

undermined the DOE's ability to set up that meeting."  [<u>Id.</u> at

21.]

The Hearings Officer concluded that Plaintiffs failed

to show that the April 14, 2011 IEP meeting was improperly

conducted without a parent in attendance and resulted in a denial

of FAPE.  [<u>Id.</u> at 26.]

### B.    Behavioral Support Plan

Under the April 14, 2011 IEP, Student was to attend the

Current Home School for the 2011-2012 school year, as she was

moving from elementary school to intermediate school.  The

Hearings Officer found that it "would not have been ethical to

prepare a functional behavior analysis ("FBA") and a [behavioral

support plan ("BSP")] for the new Home School because Student had

never been in the new Home School environment."  [<u>Id.</u> at 15.]

As to whether the Student was denied FAPE because no

BSP was in place at the time of the offer, the Hearings Officer

concluded as follows:

13

Petitioners' request for impartial hearing alleged that the DOE's offer of FAPE was not appropriate because no behavioral support plan ("BSP") had been developed for Student at the time of the offer. Petitioners made no mention of this claim in either their Opening Brief or their Closing Brief.

The DOE had developed a sufficient plan for establishing Student's BSP upon Student starting at the new Home School, so that a BSP or equivalent thereof would cover Student at the offered placement.

Petitioners have not met their burden that the April 14, 2011 IEP was insufficient because of the lack of a BSP.

[Id. at 27.]

## C.   Extended School Year Services

As to Plaintiff's ESY claims, the Hearings Officer noted that these same ESY services were provided in Student's previous IEP, which was developed with the Parents' input. He concluded that the ESY provision "was appropriate based upon the information available to the DOE and could have been revised if necessary when input was received from Parents." [Id. at 14.]

He then ruled that:

Petitioners' request for impartial hearing alleged that the DOE's offer of FAPE was not appropriate because Extended School Year Services ("ESY") were improperly constituted because they failed to consider Student's individual needs during breaks. Petitioners made no mention of this claim in either their Opening Brief or their Closing Brief.

The provision of ESY services after one day was sufficient for Student's individual needs.

Petitioners have not met their burden to show that the ESY services in the April 14, 2011 IEP

14

failed to properly consider Student's individual
needs during school breaks.

[Id. at 27.]

**D.    Transition Plan**

With respect to Student's Transition Plan, the Decision

states as follows:

> Petitioners' request for impartial hearing alleged
> that the DOE's offer of FAPE was not appropriate
> because of an insufficient transition plan.
> Petitioners made no mention of this claim in
> either their Opening Brief or their Closing Brief.
>   The DOE's transition plan was sufficient to
> support the Student's transfer to a new school
> environment contemplated by the April 14, 2011
> IEP.
>   Petitioners may be claiming through the
> handwritten addition to their typed request for
> impartial hearing that a transition plan needed to
> be a part of the IEP.  However, there is no
> requirement that the IEP include a transition plan
> when, as here, a student is transferring from a
> private school back to the home public school.
> B.B. v. State of Hawaii, 483 F. Supp. 2d 1042 (D.
> Haw. 2006); James M. v. State of Hawaii, 2011 WL
> 1750718 (D. Haw. 2011).
>   Petitioners have not met their burden to show
> that the offered transition plan was insufficient
> or that it was required to be an element of the
> IEP offer.

[Id. at 27-28.]

**E.    Private Placement**

Although Plaintiffs introduced evidence that Student's

private placement would be appropriate for the 2011-2012 school

year, the Hearings Officer concluded that the issue was moot

because Plaintiffs did not establish a denial of FAPE.  [Id. at

28.]

15

The Hearings Officer ultimately concluded that Plaintiffs failed to prove that the April 14, 2011 IEP denied Student a FAPE. The Hearings Officer therefore dismissed the RIH. [Id.] The instant action followed.

## II. **Plaintiffs' Opening Brief**

Plaintiffs argue that holding the April 14, 2011 IEP meeting without a parent present resulted in a denial of FAPE. They argue that the IDEA's procedural safeguards were violated, and that the DOE improperly changed Student's IEP placement "from a private regular education school, where she had been attending for many years, to a public special education classroom." [Opening Br. at 2.]

### A. **Lack of Parental Participation**

Plaintiffs first argue that the DOE did not satisfy the requirements for holding an IEP meeting with a parent in attendance. They assert that under the relevant regulations, a meeting may be conducted without a parent present only if the DOE is unable to convince the parents that they should attend. [Id. at 4 (citing 34 C.F.R. § 300.345(d), Haw. Admin. R. § 8-60-46(d)).] Plaintiffs claim that they never told the DOE that they refused to attend IEP meetings, only that they wanted to reschedule the April 14, 2011 meeting. [Id. at 4-6.] They argue that the facts here are similar to those in Shapiro v. Paradise Valley Unified School District, 317 F.3d 1072 (9th Cir. 2002),

because the DOE prioritized its personnel's schedules over that of the Parents.  Further, they argue that the impending April 21, 2011 annual review date does not affect the legal requirements for parental participation in IEP meetings.  According to Plaintiffs, failing to hold the annual IEP by the review date "would not have denied Student a FAPE."  [Id. at 9.]

Plaintiffs also contend that any participation after-the-fact does not cure the initial denial of a FAPE.  They argue that the Parents must have been included in the creation of the IEP at the April 14, 2011 meeting.  They suggest that the DOE "could have required consent from the parent to extend the prior IEP for an additional month, or postponed the meeting by having parent agree to republish the prior IEP of April 21, 2010."  [Id. at 12.]

B.    **Private Placement Was Appropriate**

Plaintiffs next argue that the Hearings Officer erred when he did not consider whether Student's private placement was appropriate.  Student's "private regular education school was determined appropriate by the administrative tribunal prior to the April 11, 2011 IEP meeting."  [Id. at 13.]

Plaintiffs also appear to invoke the IDEA's stay-put provision in their Opening Brief.  They state that the private school programs were "Student's 'current placement' at the time her parent challenged the change in her placement. . . .  Student

17

was placed at this school through her last agreed upon IEP, which makes the private school her placement during the pendency of this appeal, and makes the school district responsible for its funding." [Id.]

   C.  **Transition Plan and Additional Supports**

   Plaintiffs assert that the IEP did not include any additional supports to help student move to her proposed placement in public intermediate school.  They state that the DOE developed a Transition Plan, but that it was not incorporated into the IEP and developed by the IEP team.  [Id. at 14-5.]

## III. **Defendants' Answering Brief**

   The DOE asks the Court to affirm the Hearings Officer's Decision in its entirety.  The DOE asserts that Plaintiffs' challenges to the Decision are strictly as to the law that was applied by the Hearings Officer because the Opening Brief does not challenge any of the Hearings Officer's factual determinations.  [Answering Br. at 3-4.]

   As to the issues on appeal, the DOE notes that Plaintiffs' Opening Brief does not challenge or address the Hearings Officer's rulings on the BSP and ESY issues.  [Id. at 4-5 n.2.]  The DOE contends that the only issues properly before the Court in this appeal are: (1) whether it was proper for the DOE to hold the April 14, 2011 IEP meeting without a parent in attendance; and (2) whether the offered Transition Plan is

18

sufficient to support the Student's transfer from private school
to public school.  [Id. at 5.]

### A. **Unchallenged Factual Determinations**

The DOE first argues that the Hearings Officer's
Factual determinations are unchallenged, and should be accepted
as true, including the determination that Mother's conduct
undermined the DOE's ability to set-up Student's annual IEP
meeting.  It argues that neither the Opening Brief nor the
Complaint contains any challenge or argument that the Hearings
Officer erred with respect to any of his factual determinations,
and accordingly, the unchallenged factual determinations should
be accepted as true.  [Id. at 22.]

As to Plaintiffs' claims at the due process hearing
that Parents did not receive certain correspondence from the
school in an attempt to explain the Mother's lack of
responsiveness, the DOE argues that such claims were contradicted
by the evidence.  The DOE argues that Plaintiffs' claim that they
did not receive key correspondence from the school "is not
believable," and opine that "Parents ignored the correspondence,
or chose not read it, but they certainly received them.
Defendants submit that there was clearly a lack of good faith on
the Parents' part."  [Id. at 25.]  Further, a lack of good faith
is "evident from their failure to attend the revision IEP meeting
offered to them by the school to give them a chance to provide

their input and voice any concerns they had with the IEP." [Id.]

**B.   No Denial of FAPE**

The DOE next argues that the Hearings Officer correctly determined that holding Student's annual IEP meeting without a parent in attendance did not deny student a FAPE under the circumstances presented.  The DOE maintains that Parents made no effort to work with the school to schedule the IEP meeting, never selected a date offered by the school for the IEP, did not propose alternative dates to the school, or advise them of their availability for the IEP.  [Id.]

**C.   Transition Plan**

According to the DOE, at the administrative hearing below, Plaintiffs did not present any evidence in support of the claim that the Transition Plan was inadequate.  Moreover, they argue that the Transition Plan was comprehensive and included four phases to transition Student to public school during the summer of 2011, in which Redemption Academy and Pacific Autism Center would work collaboratively with the Current Home School. To the extent Plaintiffs fault the Transition Plan for not being part of the April 14, 2011 IEP, the DOE notes that there is no requirement that an IEP include a transition plan where the student is transferring from a private to a public school.  [Id. at 34-35.]

D.   **Stay Put**

The DOE contends that Student is not entitled to "stay put" placement at Pacific Autism Center because any procedural defect was caused by Parents.  According to the DOE, Plaintiffs simply claim that the school's holding of the annual IEP meeting without them constituted a per se violation, without challenging the content of the IEP, or the Hearings Officer's factual determination that Mother's failure to reasonably cooperate in the scheduling of the meeting prevented the DOE from holding the meeting on a date agreeable to Parents.  [Id. at 36-37.]

The DOE urges the Court to affirm the Decision in its entirety.

**STANDARDS**

I.   **IDEA Overview**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs."  Hoeft ex rel. Hoeft v. Tuscon Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310, 108 S. Ct. 592, 597, 98 L. Ed. 2d 686 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education,

21

employment, and independent living[.]" 20 U.S.C. §
1400(d)(1)(A).

The IDEA defines FAPE as

special education and related services that –

> (A) have been provided at public expense,
> under public supervision and direction, and
> without charge;
> (B) meet the standards of the State
> educational agency;
> (C) include an appropriate preschool,
> elementary school, or secondary school
> education in the State involved; and
> (D) are provided in conformity with the
> individualized education program required
> under section 1414(d) of this title.

20 U.S.C. § 1401(9). To provide a FAPE in compliance with the
IDEA, a state educational agency receiving federal funds must
evaluate a student, determine whether that student is eligible
for special education, and formulate and implement an IEP. See
generally 20 U.S.C. § 1414. The IEP is to be developed by an
"IEP Team" composed of, inter alia, school officials, parents,
teachers and other persons knowledgeable about the child. §
1414(d)(1)(B).

"Procedural flaws in the IEP process do not always
amount to the denial of a FAPE." L.M. v. Capistrano Unified Sch.
Dist., 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted).
Once a procedural violation of the IDEA is identified, the court
"must determine whether that violation affected the substantive
rights of the parent or child." Id. (citations omitted).

"[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." <u>Id.</u> (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. <u>J.W. v. Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" <u>Id.</u> (quoting <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." <u>Id.</u> at 433 (citations and quotation marks omitted).

If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency. <u>See</u> 20 U.S.C. § 1415(b)(6), (f)(1)(A). Parents may also send their student to a private program and seek retroactive tuition reimbursement from the state. <u>See</u> <u>Forest Grove Sch. Dist. v. T.A.</u>, 129 S. Ct. 2484, 2493, 2496 (2009) (citations omitted). Where parents unilaterally withdraw a child from public school, they "do so at

23

their own financial risk." Id. at 2496 (citations and internal quotation marks omitted). Parents challenging an IEP are entitled to reimbursement only if "a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act." Id. (citations and internal quotation marks omitted); see also 34 C.F.R. § 300.148(c).

## II. **Standard of Review**

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court –
> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings. L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)) (some citations omitted). The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling. J.W. ex rel. J.E.W. v. Fresno

Unified Sch. Dist., 626 F.3d 431, 438 (9th Cir. 2010) (citing

Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir.

1987)).  In reaching that determination, the court should

consider the thoroughness of the hearings officer's findings,

increasing the degree of deference where said findings are

"'thorough and careful.'"  L.M. v. Capistrano, 556 F.3d at 908

(quoting Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d

884, 892 (9th Cir. 1995)).  The district court should give

"substantial weight" to the hearings officer's decision when the

decision "evinces his careful, impartial consideration of all the

evidence and demonstrates his sensitivity to the complexity of

the issues presented."  Cnty. of San Diego v. Cal. Special Educ.

Hearing Office, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation

and quotation marks omitted)).  Such deference is appropriate

because "if the district court tried the case anew, the work of

the hearing officer would not receive 'due weight,' and would be

largely wasted."  Wartenberg, 59 F.3d at 891.  "[T]he ultimate

determination of whether an IEP was appropriate," however, "is

reviewed de novo."  A.M. ex rel. Marshall v. Monrovia Unified

Sch. Dist., 627 F.3d 773, 778 (9th Cir. 2010) (citing Wartenberg,

59 F.3d at 891).

  A court's inquiry in reviewing IDEA administrative

decisions is twofold:

> "First, has the State complied with the procedures
> set forth in the Act?  And second, is the

> individualized educational program developed
> through the Act's procedures reasonably calculated
> to enable the child to receive educational
> benefits?" [Rowley, 458 U.S. at 206-07]
> (footnotes omitted). "If these requirements are
> met, the State has complied with the obligations
> imposed by Congress and the courts can require no
> more." Id. at 207.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir.

2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on

the party challenging the administrative ruling.  Hood v.

Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)

(citations omitted).  The challenging party must show, by a

preponderance of the evidence, that the hearing decision should

be reversed.  J.W., 626 F.3d at 438 (citation omitted).

## DISCUSSION

## I.  Parental Participation

Plaintiffs argue that the DOE denied Mother her right

to participate in Student's IEP meetings and therefore denied

Student a FAPE.  This Court has previously recognized that:

> School districts have an affirmative obligation to
> take steps to ensure that parents of a student are
> present at IEP meetings or otherwise have the
> opportunity to participate.  34 C.F.R.
> § 300.322(a).  This obligation includes scheduling
> a meeting at a mutually agreed upon time and
> place, providing reasonable notice of this
> meeting, and using alternative methods, such as
> individual or conference telephone calls, to
> ensure parent participation.  § 300.322(a)-(c).

Hailey M. ex rel. Melinda B. v. Matayoshi, Civil No. 10-00733

LEK-BMK, 2011 WL 3957206, at *24 (D. Hawai'i Sept. 7, 2011).

When an IEP meeting is held without a parent in attendance, the DOE must keep a record of its attempts to facilitate parental participation as follows:

> (d) Conducting an IEP Team meeting without a parent in attendance.  A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend.  In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as--
>
> > (1) Detailed records of telephone calls made or attempted and the results of those calls;
> >
> > (2) Copies of correspondence sent to the parents and any responses received; and
> >
> > (3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

34 C.F.R. § 300.322(d).  Here, the DOE kept detailed records of its communications with Parents, and those records were not disputed at the administrative hearing below.

Plaintiffs rely on Shapiro v. Paradise Valley Unified Sch. Dist. No. 69, 317 F.3d 1072, 1077 (9th Cir. 2003), in which the Ninth Circuit emphasized "the importance of parental participation in the IEP process," stating that the IDEA requires parental presence at IEP meetings "unless they affirmatively refuse to attend."  The Ninth Circuit's finding that a school district had violated the IDEA by holding the IEP meeting without the parents turned on facts that are somewhat distinguishable

27

from those present here.  The <u>Shapiro</u> school district had
scheduled the IEP meeting for a date when the parents could not
attend; when the parents asked to reschedule, the school district
refused.  <u>Id.</u> at 1075.  The Ninth Circuit held that it was the
convening of the meeting without any attempt to accommodate the
parents that violated the IDEA, not the mere holding of the
meeting without the parents.  <u>Id.</u> at 1078.  Here, the DOE
attempted to reschedule the meeting on several occasions, but
Mother was non-responsive, and the DOE then held the meeting
anyway.

With respect to Mother's claim that she may not have
received correspondence because it was sent to her former e-mail
address, the DOE persuasively argues that such a claim is not
supported by the evidence.  For example, Mother claimed that in
February 2011 she shut down her former e-mail address and
switched to a new e-mail address.  Correspondence showed,
however, that Mother sent e-mail from the alleged former account
in early March 2011.  The DOE notes that:

> On cross-examination, Mother admitted that she
> continued to have access to her former e-mail
> account to at least late May 2011, though she
> claims she rarely checked the account.  On June 4,
> 2011, Mother sent [Student Care Coordinator
> ("SCC")] Calleon an e-mail in response to a May
> 24th e-mail that SCC Calleon sent to (Mother's
> former e-mail address) advising for the first time
> that she preferred to be e-mailed at [new email
> address].  This clearly shows that as of late May,
> Mother still had access to e-mails sent to
> (Mother's e-mail address).  SCC Calleon testified

that at no time prior to June 4, 2011 e-mail did
Mother ever notify her that her e-mail address had
changed or that she preferred receiving e-mails at
a different e-mail address. . . . Interestingly,
Mother even denied receiving SSC Calleon's e-mail
to her dated January 18, 2011, at a time when
there is no dispute that her e-mail address was
(Mother's e-mail address). This shows that Mother
was either irresponsible with checking her
e-mails, or she was not being truthful.

[Answering Br. at 24-25 (citations omitted).]

The Court accepts the Hearings Officer's uncontested

findings that:

Mother failed to reasonably co-operate in setting
up a meeting date prior to the statutory deadline.
To the contrary, her actions undermined the DOE's
ability to set up that meeting.

- Mother claims to have informed the DOE in
  early February that her e-mail address had
  changed but unreasonably failed to confirm
  this in writing so that all relevant DOE
  personnel such as [Ms. Calleon], plus [Ms.
  Kim at Redemption Academy], would be sure to
  have the new address.
- After supposedly changing e-mail addresses,
  Mother continued to communicate with [Ms.
  Calleon] using the old e-mail address. She
  did not use those communications to inform
  [Ms. Calleon] to use a different e-mail
  address. Instead, Mother's e-mails directed
  [Ms. Calleon] to respond to the old e-mail
  address. [Ms. Calleon] reasonably continued
  to use the old e-mail address through the end
  of May 2011, after which Mother finally
  informed [Ms. Calleon] to use a different
  e-mail address.
- Mother's testimony that she could anticipate
  well in advance that mid-April would be a
  time of emergencies at her work was not
  credible, and there was no evidence that
  Mother was not actually available on all days
  in the mid-April time frame proposed by the
  DOE.

- Mother wanted at least two weeks advance notice of a meeting so that she could plan her work schedule but never informed the DOE of this requirement prior to the April 14, 2011 IEP.
- After the April 14 IEP, the DOE was informed that Parents could be available only on Fridays for the revision IEP. There was no explanation for this extremely limited time period of availability, and without an explanation this was an unreasonable restriction. Further, Parents never informed the DOE before the April 14 IEP of this limited time of availability.
- Mother made an excuse about not easily getting certified mail because of not being home during the day and having to find time to go to the post office to pick up the certified mail, but none of the critical communications regarding the April 14, 2011 IEP meeting were sent by certified mail.
- Mother made an excuse about possibly not receiving regular mail because one or the other of the two children in her household could have retrieved the mail in a way that prevented Parents from seeing it. This was purely speculative, and, in any event, is the fault of Parents and not the DOE.
- Parents abruptly cancelled the revision IEP meeting without any stated reason and Petitioners presented no evidence that demonstrated the cancellation was reasonable.

[Decision at 21-23.]

With these uncontested facts in mind, the Court considers similar cases in this district that have addressed parental participation requirements. In A.R. v. Hawaii Dept. of Educ., Civil No. 10-00174 SOM/RLP, 2011 WL 1230403, at *8 (D. Hawai'i Mar. 31, 2011), the district court affirmed the Hearings Officer's finding that the DOE did not deny the student a FAPE when it failed to provide a written IEP before the start of the

school year where the failure was the result of "obstruction and delay" or "lack of cooperation" on the part of the student's mother. The Hearings Officer in that case emphasized the mother's "failure to return telephone messages, failure to follow-through with scheduling, late notice of cancellation, pre-determination of private placement, and lack of cooperation." Id.

This Court recently ruled in another case, however, that the DOE denied a student a FAPE by not allowing the mother a reasonable opportunity to attend an IEP meeting, where the mother was an active participant in the formulation of the IEPs and desired to be included in the meeting, but the DOE would not reschedule the meeting to reasonably accommodate her schedule. This Court explained in J.T. ex rel. Renee T. v. Dep't of Education, Civil No. 11-00612 LEK-BMK, 2012 WL 1995274, at *23-24 (D. Hawai'i May 31, 2012), as follows:

> The DOE informed Renee T. of the meeting the day before the meeting. Renee T. asked that they reschedule the meeting on March 5, 2010. The DOE was unable to contact Renee T. on March 3, 2010, and instead held the meeting without her. The IEP team created a provisional IEP that they later revised on May 26, 2010 and June 22, 2010, with Renee T. present.
> Renee T.'s after-the-fact participation is not enough to remedy the initial per se denial of FAPE caused by her exclusion. . . .
> The IEP team's scheduling of the March 3, 2010 meeting to meet its internal deadline is not a viable excuse. The DOE argues that the IEP team needed to hold the meeting on March 3, 2010, because that was what it believed to be its

> internal deadline for creating IEPs for the
> following school year.  The DOE cites to no
> authority that allows it to prioritize its
> internal deadlines (which the DOE implicitly
> concedes may not have been the actual deadline) or
> otherwise disregard Renee T.'s schedule.  Indeed,
> just as a school district may not "prioritize[ ]
> its representatives' schedules over [those] of
> [the] parents[,]" Shapiro, 317 F.3d at 1078 (some
> alterations in original), the DOE cannot
> prioritize its internal deadline over a parent's
> schedule, especially when the parent is given only
> a day's notice and makes a good-faith effort to
> reschedule.

(Some citations omitted) (alterations in Renee T).  In the

instant case, however, it appears that Parents were given more

than a day's notice and, as set forth by the Hearings Officer,

Parents did not make a good-faith effort to reschedule.

In sum, the Court concludes in the instant matter that

Plaintiffs were not denied a FAPE.  The DOE has an obligation to

schedule an annual IEP review and, while parental participation

is a critical component of an IEP meeting, the DOE's requirement

to secure parental participation has to be met with reasonable

efforts.  On the specific facts of this case, the DOE did not

fall short of its obligation.  The system functions best when

parents are required to be reasonably responsive to the DOE's

efforts to schedule the IEP.  Here, the Hearings Officer did an

admirable job of setting forth the facts in the record supporting

his conclusion that Parents failed to show that the April 14,

2011 IEP meeting was improperly conducted without a parent in

attendance.  The Court AFFIRMS the Decision on this issue.

## II.  <u>Transition Plan</u>

Plaintiffs assert that the DOE developed a Transition Plan, but that it was not incorporated into the IEP, and therefore, the IEP did not consider Student's unique needs and was not designed to offer Student educational benefits.  With respect to Student's Transition Plan, the Hearings Officer found that:

> The DOE's transition plan was sufficient to support the Student's transfer to a new school environment contemplated by the April 14, 2011 IEP.
> Petitioners may be claiming through the handwritten addition to their typed request for impartial hearing that a transition plan needed to be a part of the IEP.  However, there is no requirement that the IEP include a transition plan when, as here, a student is transferring from a private school back to the home public school.  <u>B.B. v. State of Hawaii</u>, 483 F. Supp. 2d 1042 (D. Haw. 2006); <u>James M. v. State of Hawaii</u>, 2011 WL 1750718 (D. Haw. 2011).

[Decision at 27-28.]

The Court concludes that the Decision correctly held that the DOE was not required to include a Transition Plan in this particular IEP, and that the plan was sufficient to support the Student's transfer to a new school environment.  As this district court has explained:

> under the IDEA, the DOE is not required to provide a transition plan in an IEP whenever a child moves from a private to a public school. . . .  However, transition services must be included in an IEP only in certain circumstances such as when a child is moving from school to post-school activities, to postsecondary activities, to vocational training, etc.  "[T]he

33

statutory provision of the IDEA specifically addressing
transition services does not mandate such services when
a transition from private to public school takes
place." <u>James M. v. Hawaii, Dept. of Educ.</u>, Civ. No.
10-00369 LEK, 2011 WL 1750718, at *11 (D. Haw. Feb 25,
2011) (quoting <u>B.B. v. Hawaii, Dept. of Educ.</u>, 483 F.
Supp. 2d 1042, 1056 (D. Haw. 2006) (citing <u>L.M. v.
Dept. of Educ.</u>, Civ. No. 05-00345 ASK/KSC, 2006 WL
2331031, at *16 (D. Haw. Aug. 9, 2006))). As E.Y. was
to move from Variety, a private school, to Kaimuki, a
public school, the DOE was not obligated to include a
transition plan in the IEP. <u>See James M.</u>, 2011 WL
1750718, at *11 ("Given that James M. was to be moved
from Loveland, a private school, to Kahuku, a public
school, the School District was under no obligation to
provide transition services for James M.").

<u>L.I. v. State of Hawaii, Dep't of Educ.</u>, Civil No. 10-00731

SOM/BMK, 2011 WL 6002623, at *6 (D. Hawai'i Nov. 30, 2011) (some

alterations in <u>L.I.</u>); <u>see also</u> <u>Donna S. v. Hawaii</u>, Civil No.

12-00069 JMS-KSC, 2012 WL 4017449, *8 (D. Hawai'i Sept. 12, 2012)

("Given that the IDEA explicitly provides that section outlining

the requirements of an IEP shall not 'be construed to require

. . . that additional information be included in a child's IEP

beyond what is explicitly required in this section,' 20 U.S.C. §

1414(d)(1)(A)(ii), this omission is meaningful—a transition plan

is not required to be a part of an IEP."); <u>Carrie I. ex rel. Greg

I. v. Dep't of Educ.</u>, Civil No. 11-00464 JMS-RLP, 2012 WL

2353850, at *13 n.16, *15 n.17 (D. Hawai'i May 31, 2012) (noting

that a claim based on an IEP's lack of a transition plan fails as

a matter of law); <u>Dep't of Educ., Hawaii v. C.B. ex rel. Donna

B.</u>, Civil No. 11-00576 SOM/RLP, 2012 WL 1537454, at *5 (D.

Hawai'i May 1, 2012) ("[A]s previously stated by this court, the

DOE is not required to include a transition plan in an IEP whenever a child moves from a private institution to a public school."); <u>James M. ex rel. Sherry M. v. Hawaii</u>, 803 F. Supp. 2d 1150, 1164 (D. Hawai'i 2011) ("This Court has previously held that while 'the IDEA requires an IEP to have a statement of needed transition services in some circumstances, the statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place.'" (quoting <u>L.M. v. Dep't of Educ.</u>, Civ. No. 05-00345 ACK/KSC, 2006 WL 2331031, *16 (D. Hawai'i Aug. 9, 2006)). The Court therefore AFFIRMS the Decision with respect to Plaintiffs' claims regarding the Transition Plan.

### III. **Stay Put**

Plaintiffs argue for the first time in their Opening brief that they are entitled to "stay put," without sufficient discussion of the factual or legal bases for their request. On August 24, 2012, Plaintiffs filed a Motion for Stay Put, specifying that they seek reimbursement for Student's special education and related services at Pacific Autism Center from December 1, 2011 through May 9, 2012, and additional "stay-put payments through the conclusion of these proceedings and any appeal." [Motion for Stay Put (dkt. no. 27), at 2.] The Court set forth a briefing schedule and will rule on Plaintiffs' Motion for Stay Put in due course.

## CONCLUSION

On the basis of the foregoing, the Hearings Officer's November 29, 2011 Findings of Fact, Conclusions of Law and Decision is HEREBY AFFIRMED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 25, 2012.



 /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

RACHEL L., ET AL. V. STATE OF HAWAII, ET AL; CIVIL NO. 11-00756 LEK-BMK; ORDER AFFIRMING HEARINGS OFFICER'S NOVEMBER 29, 2011 DECISION